

NOV 1 7 2020

AT GREENBELT
CLERK U.S. DISTRICT COURT
DISTRICT OF MARYLAND

DEPUTY

# IN THE UNITED STATES DISTRICT COURT

# DISTRICT OF MARYLAND

November 11, 2020

---

JONATHAN MANSON
6213 N Pascola Circle
Tucson, AZ,

Plaintiff,

   v

MARYLAND BOARD OF
   PHYSICIANS,
4201 Patterson Ave
Baltimore, MD 21215,

Defendant

**<u>COMPLAINT</u>**

Civil Action No.: SAG-20 CV 3345

---

Plaintiff Jonathan Manson (referred to throughout the complaint as JM) states,

alleges, and claims as causes of action against Defendant as follows:

1

## PRELIMINARY STATEMENT

1.   This action seeks (1) equitable relief from the unlawful policies, practices, and actions of Defendant Maryland Board of Physicians (2) a declaratory judgment, for actions which have violated and continue to violate Plaintiff's rights pursuant to Title II of the Americans with Disabilities Act of 1990 ("ADA"), 42 U.S.C. § 12131 et *seq.* (2002), and Section 504 of the Rehabilitation Act ("Rehabilitation Act"**),** 29 U.S.C. § 794 *et seq* (2011) (3) **injunctive** relief requiring Defendant to **correct its violations** of **Plaintiff's federal rights**, **prohibiting** Defendant from continuing its current actions in violation of the ADA and Rehabilitation Act, and from engaging in similar conduct in the future, and (4) fees and court costs pursuant to 42 U.S.C. § 12205 (2010) and 29 U.S.C. § 794(a), and under 42 U.S.C. § 1988.

2.   Statement from the ADA Compliance Manual: *Is a State agency immune from suit under the ADA?* No. A State agency such as the Maryland Board of Physicians is not immune from an action in Federal court for violations of the ADA.[1]

---

[1] https://www.ada.gov/taman2.html#II-4.3200

2

## JURISDICTION AND VENUE

1.  This Court is vested with original jurisdiction of these claims pursuant to 28 U.S.C. §1331 (2011), §2201 (2015).

2.  This Court has jurisdiction to hear and decide Plaintiff's ADA and Rehabilitation Act claims pursuant to 42 U.S.C. §12188 (2015),§ 12189 (2008), and 29 U.S.C. § 794(a), as the Plaintiff's claims arise under and are based upon violations of Title II of the ADA, 42 U.S.C. §12182, *et seq.* (2010) and Rehabilitation Act, 29 U.S.C. § 794 et  *seq.*, and 42 USC 2000(e).

3.  This court has jurisdiction to grant declaratory relief in this action pursuant to 28 U.S.C. § 2201.

4.  Venue for this action is proper in the United States District Court for the District of Maryland pursuant to 28 U.S.C. §§ 100 and §1391(b)-(c) (2015) because all conduct complained of herein occurred in Baltimore, Maryland, and the subject public entity and services immediately at issue are located in Baltimore.  The Defendant to this action also has offices and conducts official duties in the city of Baltimore.

## PARTIES

1.    Plaintiff JM is and was at all times alleged herein a citizen and resident of the State of Arizona. JM is a qualified person with a disability as defined by the ADA and the Rehabilitation Act.

2.    Defendant Maryland Board of Physicians is a public agency which is a subdivision of the Department of Health, providing health related services to individuals in the State of Maryland. It is a public entity subject to the ADA and a recipient of federal funds subject to the Rehabilitation Act.

3.    At all relevant times, Defendant was, is and will be acting under color of state law, custom and usage, and was, and is a state actor.

## OPERATIVE FACTS[2]

1.  JM is a 62-year old individual with Autism Spectrum Disorder (ASD), formerly known as Asperger's Syndrome, which is a disability as defined by the ADA and the Rehabilitation Act, described in JM as permanent and incurable. Exhibit 1.

2.  Plaintiff JM was never a resident, employee, trainee, or physician in Maryland, or physician in any other state. JM has also been homeless multiple times after 1998, unemployed for multiple months and years at a time[3], and filed for Chapter 7 bankruptcy in federal court in 2003.

3.  **Purpose of this filing, in brief**: The Maryland Board of Physicians, formerly known as the BPQA (the Board) issued a medical license denial for Plaintiff in 1998, described in detail on page 7. The license denial was reported nationally to the American Medical Association (AMA), Department of Health and Human Services (HHS), all JM's medical training programs, national background check companies, Verisys (a national nonmedical and medical licensure data bank), the FACIS (Fraud and Control Information System) III, and the FSMB (Federation of State Medical Boards). **The Board has a stated policy that it supports the Americans with Disabilities Act.[4] When JM made an ADA Title II reasonable accommodation request in good faith to the Board and Board Counsel, to remove such reports after 21 years**

---

[2] Operative facts are not another attempt at a licensure appeal, though the Board will insist it is. The operative facts are provided to explain the reasoning for the ADA Title II accommodation request.
[3] Plaintiff will supply a social security statement or other related documents at discovery if needed
[4] https://www.mbp.state.md.us/forms/dr_initial.pdf

because along with autism, these reports are interfering with many opportunities to be employed in professions requiring licensure, [page 12], no response was ever received.  The Board is required to provide a response as to why it is an undue burden to accommodate Plaintiff, or why Board policies or procedures cannot be modified to accommodate Plaintiff.  The ADA Title II accommodation request emphasizing ASD/autism is a federally protected right for those with a bonafide disability[5].

4.  <u>**Why was the accommodation request made, more specifically**</u>? In **order to manage** his **Autism Spectrum Disorder and be self-supporting,** JM, through the ADA accommodation, seeks to be gainfully employed in a nonmedical field requiring licensure, by having the Board remove its barriers to nonmedical licensure and employment.  Such barriers have existed for 22 years.

5.  <u>**Plaintiff graduate educational history**</u>:  JM attended/completed:  Whittier Law School, JD; St. Thomas University, MS; Creighton University School of Medicine, MD.   He is, in every way in 2020, a qualified person with a disability and is able to successfully and can safely function, if given the opportunity to be employed in a non-health care position, one which is outside the police powers and purvue of the Board.

6.  <u>**Plaintiff medical training history, 1991-1996**</u>:  JM participated in six medical training programs, though had difficulty adjusting socially at the first three

---

[5] https://www.ada.gov/taman2.html#II-4.2000

programs due to autism, with resulting discontinuous medical training.  The first

program was in Danbury Connecticut, where JM had to resign after 5 months due to

Asperger's syndrome affecting his performance.  The resignation states "...I resign for

**medical reasons**…**no conduct on my part**…**warrants such report**…" and is signed

by the Vice President of Human Resources.  Exhibit 2.  The second training program in

pathology was a termination after 2 months, again due to Asperger's.  In the third

program, after 1-month, JM was placed on 5 months paid leave and left voluntarily to

enter one year of continuous training. Exhibit 3.  JM then passed the final licensing

exam, and took part in an Anesthesiology program, completing 5 months but left

voluntarily due to changes in the practice of Anesthesiology, to return to primary care.

Exhibit 4. The final program occurred in 1995-1996, when JM completed 9 months of a

12-month program.  Exhibit 5.  In 1997, JM completed a Master's degree in

Management at St. Thomas University of Miami, Florida.

    7.  **The Maryland BPQA, Autism, and federal protected rights**:

    In 1997, JM applied for medical licensure in Maryland, and was issued a

non-disciplinary, non-permanent initial denial, which claimed that JM intentionally left

off incomplete **first year training in different specialties**.  The application responses

that did not meet Board standards were provided to questions that were **vague and**

**ambiguous, and never again used by the Board.**[6]  Additionally, a medical

explanation of how the questions were interpreted due to autism, or how autism related

---

[6] Plaintiff located/copied Board medical license applications from 2001, 2009, and 2018-to be provided at 26f conference if needed

to JM's performance in the training programs, was never allowed prior to the initial denial.

JM attempted to arrange a hearing to challenge the initial denial. An evidentiary hearing was noticed by the Board seven times, and JM was summoned to a hearing as well, but the Board still denied any right to appear. Through denying an evidentiary hearing, JM lost any opportunity to discuss Asperger's/autism or call an expert witness to explain the mens rea of those with autism, and apply such explanations to JM. The Board explained that a planned disability hearing request is "wastage" and continued to accuse JM of fraudulently and deceptively concealing application information and providing willful misrepresentations.

JM was finally given 15 minutes to speak in September 1998, where no new issues could be raised. JM could only note Supreme Court cases against using summary judgments[7] for malintent cases, background on the issue, and social interaction issues in the training programs without being allowed to raise autism or medical issues. The Board continued to ignore medical/Asperger's/autism explanations, and emphasized issues of malintent and fraud, insisting there were no genuine issues of material fact, including disability issues. Exhibit 7.

---

[7] In addition, the Supreme Court has cautioned that "summary procedures should be used sparingly . . . where motive and intent play lead roles . . . It is only when witnesses are present and subject to cross-examination that their credibility and the weight to be given their testimony can be appraised." *Pollar v. Columbia Broadcasting Sys., Inc.*, 368 U.S. 464, 473, 82 S.Ct. 486, 491 (1962)

### 8. <u>Autism Spectrum Disorder as it relates to Mens Rea</u>

Those with Asperger's/Autism Spectrum Disorder (ASD) are not usually dishonest by nature.  What appears to be dishonesty is usually due to a misunderstanding or interpretative analysis defect, not intentional misrepresentation or civil fraud. "..the court must consider the unique factors that affect the ASD defendant and whether those factors amounted to an impairment or disability impacting culpability."[8]  Plaintiff realizes that civil fraud is not a criminal charge in Maryland. However, out-of-state jurisdictions and many employers seeing the word fraud or fraudulent associate it with criminal conduct, especially when associated with a permanent licensure denial. Employers will also rarely hire an applicant accused of such conduct[9]; of those with autism and prior conduct issues, nearly none[10] are hired.

A mens rea analysis for those afflicted with ASD (as noted above was formerly known as Asperger's syndrome) is also critical in either administrative proceedings or court cases.  To demonstrate, in the following case: in *State v. Burr*, 2013 N.J. Super. Unpub. LEXIS 1130, at *1 (N.J. Super. Ct. App. Div. May 13, 2013), defendant was charged with second-degree aggravated assault and second-degree endangering the welfare of a child. He was convicted of second-degree aggravated assault and third-degree endangering a minor (*State v. Burr*, 2008). On appeal, the New Jersey Superior Court reversed the decision and remanded the case for a new trial on the basis

---

[8] https://www.purdueglobal.edu/blog/criminal-justice/autism-and-the-criminal-justice-system/
[9] https://www.nytimes.com/2015/03/01/business/out-of-trouble-but-criminal-records-keep-men-out-of-work.html
[10] https://link.springer.com/article/10.1007/s40489-014-0041-6

9

that the trial court erred when it excluded defendant's request to present expert
testimony regarding his diagnosis with Asperger's Disorder (*State v. Burr*, 2013).
Though the aforementioned case is criminal in nature, the mens rea analysis conducted
is therefore critical to understanding **intent** and **state of mind** of those afflicted with
ASD.

9. **The Permanent Licensure Denial distinction by the Board**

The information on the Plaintiff medical licensure denial including an
accusation of fraudulently and deceptively attempting to obtain a license was reported
as a **permanent denial**-which never occurred-nationally to the National Practitioner
Data Bank, American Medical Association, US Department of Health and Human
Services, Federation for State Medical Boards, and in 1998 to at least two background
check companies, Precise Hire and Exact Background Checks, and to Verisys and
FACIS III (licensing Board background check resources). Exhibit 7.  It is negligent and
may have been intentional[11] to list a permanent denial nationally to at least ten agencies
when it never occurred.  **A permanent denial would mean a heinous act or act of
moral turpitude was committed to ban re-application for licensure lifelong such as
serious felony, pedophilia, a capital crime, or permanent and malicious harm to a**

---

[11] Assertion is consistent with the fact that the Board would not allow an evidentiary hearing in 1998, no
Plaintiff evidence was ever considered relevant, material or to have any merit; Plaintiff in 1998, 2001 and 2011
requested removal of the permanent denial and was denied; The Board attempted to implement a Medicare exclusion
and debarment for Plaintiff in 1999 as well by contacting HHS-HHS would not implement despite the Board's
attempts to punish Plaintiff; The Board contacted the AMA so that Plaintiff could no longer be a member of the
AMA; The Board sent the Final Order to every one of Plaintiff's training program so he could never obtain a
reference from such training programs.  The above occurred despite the fact that the medical licensure application
questions upon which the Board decision was made were vague and ambiguous, and were all removed from
Maryland in 1999, and have never again been used on any medical licensure applications.

patient.  **The permanent denial ruling remained in place for 21 years** and still exists

at the background check companies, Verisys, and FACIS III.   The Board cannot act in

an ad hoc manner, through sending a permanent denial notification nationally to

multiple authorities when it never occurred, in order to inflict unlimited suffering on an

autistic applicant.

10. **The Unknown Gender Board entry following the licensing denial**

**Plaintiff's gender was also assigned by the Board nationally as "unknown"**

**in 1998, following the licensing denial, and remained on the NPDB for 21 years**

(Exhibit 7).  Plaintiff has always been male.  The term "unknown gender" assigned by

the Board is interpreted most often in one of the following categories:  non-binary,

along with agender, bigender.[12]

Plaintiff has also **never self-identified as anything but male**.  The Board

cannot invent gender distinctions of its own choosing for Plaintiff under federal law.  It

is negligent to list an unknown gender when the Board is aware of Plaintiff's gender for

the entire time frame of 21 years, and it also violates 42 USC §2000(e), and Title VII of

the Civil Rights Act of 1964, because Plaintiff never self-identified as anything but

male, the Board was aware he was male, yet listed unknown gender anyway.[13]  The ten

sources to which the Board sent this notification in 1998 use this notification in

employment decisions, which includes refusing applicants due to an unknown gender

---

[12] https://www.healthline.com/health/different-genders
[13] *Bostock v. Clayton County* (2020) The Court held that Title VII of the Civil Rights Act of 1964 forbids employment discrimination based on sexual orientation and gender identity. This ruling clearly states that sexual orientation and gender identity discrimination are sex discrimination for the purpose of the Act, and are therefore illegal under federal law.

distinction, so it is discriminatory to identify an autistic individual as an unknown

gender for 21 years if he/she wishes to be classified as male or female and nothing else.

11. **Autism and Homelessness**:  At the time of dissemination of licensure

information in 1998, there were 2.4 million websites[14], as opposed to 2 billion

currently[15], and the impact on employment and other positions could not be forseen in

1998.  JM had $250 in the bank in 1999, and was homeless with ASD, and had no

opportunity to travel back to Maryland to appeal the licensing decision.  No ADA

issues or medical or disability reasons were considered in the initial licensure analysis

by the Board, because all information provided by Plaintiff was considered irrelevant,

immaterial, and without merit.

In addition, as it has done from the time of the application filing until the

present, including the accommodation request, the Board would also have opposed

every word of an appeal by Plaintiff as lacking merit, or as irrelevant and immaterial,

including any medical or disability information presented. In addition, a Board cannot

cite an appeal as the only means of resolving disability matters, especially when the

original proceeding required an expert witness to discuss the mens rea of autism, and

the fact that new issues cannot be raised on appeal.

12. **Adhering to the Supremacy Clause**:

Due to the Supremacy Clause, the Board cannot excuse discounting and

deeming an accommodation request as being irrelevant, immaterial and without merit.

---

[14] https://obrienmedia.co.uk/blog/1991-to-2019-how-many-websites-are-there-now
[15] https://hostingtribunal.com/blog/how-many-websites/#gref

The President of the United States  signed Title II ADA into law on July 26, 1990, after

being passed by nearly the entire US Congress, 377-28 in the House, and 76-8 in the

Senate which allowed for accommodation requests at all state agencies for those with

bonafide disabilities.[16]  The entire point of the ADA was to overcome disability

inequalities among US citizens with autism and other conditions by allowing for

**federally protected rights.  It was not to be ignored, deemed irrelevant, and**

**lacking merit for certain applicants that the Board considers to be in need of**

**punishment, or whom the Board considers to be bothersome, a nuisance, or a**

**non-person not worthy of any consideration for an accommodation.  Title II ADA**

**and accommodation requests also overrule state agency preferences as well**

**through the Supremacy Clause, unless the agency can state why it is an undue**

**burden to grant the accommodation request**. Page 22 *infra*.

    13.   **The Board Order, USAF, and Bar Admission**

    JM continued to seek employment positions after the license denial, but received

multiple denials, the first by the United States Air Force (USAF)-**noting the**

**permanent denial that never occurred**.  JM then attended and graduated from

Whittier Law School, finishing 61/167 in the law school class, passed the New Mexico

bar exam with essay scores in the top 5% of bar examinees, but was denied bar

admission in 2003 due to the 1998 Board order.  Upon reapplication to the New Mexico

Bar in 2004, despite acceptance by the New Mexico Supreme Court of an explanation

---

[16] https://www.govtrack.us/congress/votes/101-1990/h228

that autism caused the issues raised in the 1998 Board license denial, and a

determination that the events were not related to poor character or malintent and instead

to autism, admission was still not granted due to reticence and reaction to the 1998

Board Order.  Exhibit 1.  The 1998 Board order therefore interfered with two attempts

at bar admission.  The Board was made aware of this ruling, describing Asperger's

syndrome as a permanent and incurable disorder, and discounted it completely, along

with the 2020 accommodation request described in paragraph 13.

14.  JM could only work as a substitute teacher in AZ until 2004, because Verisys

and online background checks were not performed for teachers in AZ and other states

until 2004.  Whenever a background check has been run on Verisys or FACIS III after

2004, JM is denied the opportunity to work in substitute teaching in any state.  JM

obtained limited work as a researcher, but when applying during and after this position,

background checks have been performed by multiple companies revealing the

Maryland order, preventing JM from being hired to research positions and those

requiring licensure.

15.  **2019 Board contact by Plaintiff and Why the statute of limitations does**

**not apply in this case**:  The Board was again contacted in 2019 to remove the

permanent denial and unknown gender notifications which had existed for 21 years.  As

noted above, a permanent denial never occurred in 1998 though reported by the Board

for 21 years on the National Practitioner's Data Bank (NPDB) report and externally,

and the Plaintiff's gender as well was never in question or controversy.  The permanent

denial and unknown gender were finally removed after 21 years, but only from the

NPDB report; in exchange for removing the permanent denial and inserting the male

gender notification, the narrative was **derogatively changed by the Board on**

**September 3, 2019,** to now reflect JM as one who has **poor character, along with**

**committing additional heinous acts**, even 21 years after the original Maryland Board

denial, **and the Board aware that JM has a medical condition that affects his social**

**skills and functioning**.  Exhibit 7.

16.  Given that in nearly every opportunity sought, the Board licensing Order of

1998 appears during the background check process, for example, when a teaching

license or research position is sought, the Board Order after 22 years is preventing an

autistic sufferer from having numerous opportunities at gainful employment in multiple

fields.

17.  As stated *supra*, the Board states on its website that it "supports" the

Americans with Disabilities Act.  The term "support" does not mean the same as an

intent to follow federal law, and is associated with the word guideline vs the law.[17]

Words associated with guidelines are:  support, encourage, enhance, partner with,

recommend, grow, develop, cultivate, foster; while words associated with adhering to

ADA Title II are shall, must be, requires or required, and obligatory.[18]

JM wrote two requests in good faith, to two different individuals on the Board

staff, for a reasonable ADA accommodation request-a statutory protected right under

---

[17] https://www.tempe.gov/home/showdocument?id=41925
[18] Ibid.

Title II ADA[19] and Section 504 of the Rehabilitation Act on **February 24, 2020.**  The

request was to withdraw the NPDB report, and its descriptive reports from Verisys

(FACIS III), which is a licensure background check service used for teaching and other

fields requiring licensure.  Accompanying the written request was a ruling from the

NM Supreme court verifying that JM has a permanent, incurable disorder of Asperger's

syndrome.   A copy was sent both to the Board and the Board Counsel, Noreen M.

Rubin, both on February 24, 2020.  Exhibit 8.  Though receipt was acknowledged,

Exhibit 9, no response was ever received.  The Board failed to address the issue of

alternate accommodations, why an undue burden would be posed, or why a minimal

modification of policies, practices and procedures could not take place.   DOJ was then

contacted concerning the Title II ADA matter above and issued a letter indicating it

could not take any further action, but that I may pursue litigation.  See Exhibit 10.

    18. Due to Defendant's ongoing refusals to respond to an accommodation

request or accommodate JM's disability and medical needs, he has been denied his

right to be employed as a teacher, in law, and in research positions which perform

selective background checks which reveal the Board Order from 1998.

    19. As a result of Defendant's conduct and policies, JM has suffered damages,

including, but not limited to, loss of multiple employment opportunities and severe

emotional distress and psychological injury.

---

[19] https://webapps.dol.gov/elaws/odep/glossary.aspx?Glossary_Word=Reasonable

20.  Unless and until Defendant relents and complies with **federal disability statutes by granting** the requested accommodation, JM will not be allowed to work in teaching, law or other selective research positions which perform FACIS III and Verisys background checks.  Such extensive background checks were not foreseeable in 1998 when a miniscule percentage of the information present now was available online.

## CAUSES OF ACTION

1.  Plaintiff JM repeats and re-alleges each and every allegation contained in the foregoing paragraphs and incorporates the same herein by reference.

2.  JM brings this action under Title II of the ADA, 42 U.S.C. §12131, et *seq.* (2002); and the Rehabilitation Act 29 U.S.C. § 794, et *seq* (2011), including the doctrine of third party interference.

3.  "[A]ny department agency, special purpose district, or other instrumentality of a State or States or local government" are Public Entities under the ADA. *Id.*§ 12131(1)(B).

4.  Under the Rehabilitation Act, "a licensing agency" is a covered "program or activity," if it receives Federal funds. 29 U.S.C. § 794(b)(2)(B).

5.  Title II of the ADA prohibits, *inter alia,* discrimination on the basis of disability by any public entity. *See* **42 U.S.C.** § 12132 (2010). Public entities, in order to avoid discrimination, must "make reasonable modifications in policies, practices, or procedures, when the modifications are necessary to avoid discrimination on the basis

of disability, unless the public entity can demonstrate that making the modifications

would fundamentally alter the nature of the service, program, or activity." 28 C.F.R. §

35.130(b)(7)(i) (2008). In addition, "[n]o qualified individual with a disability shall, on

the basis of disability, be excluded from participation in or be denied the benefits of the

services, programs, or activities of a public entity, or be subjected to discrimination by

any public entity." *Id.* at § 35.130(a). Finally, public entities must "administer services,

programs, and activities in the most integrated setting appropriate to the needs of

qualified individuals with disabilities." *Id.* at §35.130(d).

6.   The Rehabilitation Act prohibits discrimination on the basis of disability by

any covered program or activity receiving financial assistance from the Federal

government. 29 **U.S.C.** § 794(a). Discrimination under the Rehabilitation Act includes

a covered entity, in **providing an** "aid, benefit, **or service," denying a** qualified

individual with a **disability** 'the opportunity to participate in or benefit from the aid,

benefit or service." 34 C.F.R. § 104.4(b)(1)(i) (2012). Covered entities also must not

provide those aids, benefits, or services to qualified individuals with disabilities in a

manner that is not equal to or as effective as that provided to others. *Id.* at §§

104.4(b)(1)(ii)-(iii).

7.   The Doctrine of third party interference is as follows: 42 U.S.C. § 12203(b)

and 42 U.S.C. § 12203(c):  It shall be unlawful to coerce, intimidate, threaten, or

interfere with any individual in the exercise or enjoyment of, or on account of his or her

having exercised or enjoyed, or on account of his or her having aided or encouraged

any other individual in the exercise or enjoyment of, any right granted or protected by this chapter.  In announcing the standard for establishing an ADA interference claim (which is the same under Section 504 of the Rehabilitation Act, the law at issue in *Frakes*[20]), the Seventh Circuit borrowed from its standard for interference claims pursuant to the Fair Housing Act ("FHA"), holding that:  [A] plaintiff alleging an ADA interference claim must demonstrate that: (1) he/she engaged in activity statutorily protected by the ADA; (2) he/she was engaged in, or aided or encouraged others in, the exercise or enjoyment of ADA protected rights; (3) the defendant(s) coerced, threatened, intimidated, or interfered on account of his or her protected activity; and (4) the defendant(s) were motivated by an intent to discriminate.

8. As described, *supra,* Defendant denied JM access to multiple employment fields despite a detailed description and proof of his disability through failing to remove its licensing Order findings from Verisys and the NPDB after 22 years, when there was failure to acknowledge the bonafide disability, and failure to acknowledge a reasonable accommodation request made in good faith. Defendant has also failed to modify its policies and procedures to avoid this discrimination against JM.

9. As Defendant refused to modify its policies for JM and denied him full and equal access to multiple employment fields based solely on his disability of ASD, (which accounts for past perceived conduct and relationship issues), by removing the Verisys, and/or NPDB reports which have prevented him from being employed in

---

[20] U.S. Court of Appeals for the Seventh Circuit in *Frakes v. Peoria School District No. 150*, 872 F.3d 545 (7th Cir. Sept. 26, 2017)

19

multiple fields for 22 years, they have violated Title II of the ADA and the Rehabilitation Act.

10.   JM, despite his ASD, as stated above, is completely able to be employed in multiple fields should the Board Order not be present nationally.  Defendant's denial of access to multiple employment fields and failure to accommodate, solely on the basis of JM's **Autism constitutes intentional** disability-based discrimination.

11.   Defendant's conduct, described above, was intentional and taken in reckless disregard of the rights afforded JM under the ADA and Rehabilitation Act.

## Count One

**(Failure to Modify Policies, Practices, or Procedures in Violation of ADA Title II)**

1.   Plaintiff JM repeats and re-alleges each and every allegation contained in the foregoing paragraphs and incorporates the same herein by reference, and further alleges as follows:

2.   Pursuant to Title II of the ADA, Defendant is prohibited from failing to make reasonable modifications to policies, practices, or procedures when such are necessary to avoid discrimination, unless such criteria can be shown to "fundamentally alter the nature of the service, program, or activity."  28 C.F.R. § 35.130(b)(7)(i).

3.   Defendant's refusal to modify its policies, practices, or procedures prevents JM from non-healthcare employment, outside the police powers of the Board. The requested modifications by JM, if granted, would not constitute a fundamental alteration of those services.  Voiding an NPDB report for the autistic non-practitioner

Jonathan Manson would take approximately two minutes; removing the Final Order summary from Verisys or FACIS III would take approximately fifteen minutes through website or paper notification.  Defendant's actions result in discrimination based on JM's disabilities, in violation of Title II of the ADA and implementing regulations.

## Count Two

**(Failure to respond to a reasonable accommodation request under Title II of the Americans with Disabilities Act of 1990 ("ADA"), 42 U.S.C. § 12131 et *seq.* (2002), and Section 504 of the Rehabilitation Act ("Rehabilitation Act")**

1.  Plaintiff JM repeats and re-alleges each and every allegation contained in the foregoing paragraphs and incorporates the same herein by reference, and further alleges as follows:

2.  JM is a qualified person with a disability and is entitled to the protections afforded by the ADA and Rehabilitation Act as described herein.

3.  Defendant by its conduct herein alleged, willfully and without justification discriminated against JM on the basis of his disability and have deprived JM of his right to reasonable accommodation under the Rehabilitation Act and ADA Title II.

4.  As a result of denials by the Board and Board Counsel not responding in February 2020, stating why it is an undue burden to remove the reports on JM, or why policies and procedures cannot be modified even minimally to accommodate such a request, and subjecting JM to 22 years of occupational denials, [which included the listing of a permanent licensure denial on the NPDB report and at other entities when it

never occurred], JM has suffered anxiety and other distress.   Furthermore, such

distress was exacerbated by the Board denying acknowledgment of ASD in refusing to

address an accommodation request at all, and having multiple reports at every JM

training program, the AMA, HHS, NPDB, Verisys and FACIS III, and multiple

background check companies, which have interfered with his ability to obtain

employment at the USAF, in legal positions, in research positions, and in teaching

positions for 22 years.

5.  By virtue of their foregoing conduct, defendants have violated ADA Title II

and the Rehabilitation Act and JM is entitled such relief as the Court finds to be

appropriate, including, but not limited to, declaratory relief, injunctive relief,

compensatory damages, punitive damages, and the costs and expenses of this action.

## Count Three

### (42 U.S.C. § 12203(b) ADA Third Party Interference)

1.  Plaintiff JM repeats and re-alleges each and every allegation contained in the

foregoing paragraphs and incorporates the same herein by reference, and further alleges

as follows:

2.  The ADA's third party interference provision provides:  It shall be unlawful to

coerce, intimidate, threaten, or **interfere with any individual in the exercise** or

enjoyment of**,** or on account of his or her having exercised or enjoyed, or on account of

his or her having aided or encouraged any other individual in the exercise or enjoyment

of, any right granted or protected by this chapter.

22

3. **Use of a purposefully reconstructed harmful narrative in a federal data bank to punish a citizen with autism/ASD is also not allowed.  The punishment is to ensure that the Board Order has the maximum detrimental effect, as a means of retaliation after Plaintiff requested that the NPDB report add a fact pattern or be removed after 21 years.**

4.   The ADA third party interference theory generally cannot be applied to a state agency that licenses or certifies individuals to work in a particular profession under the EEO statues where it is exercising its police power in granting and denying licenses.  However, a licensing agency could be liable under third party interference when it exercises a function beyond merely its police powers[21].  For example, preventing JM from working in teaching or law nationally due to the Board's listings on Verisys, FACIS III and the NPDB/HIPDB merged databank, which are not private, and accessible by hundreds of background check companies, teaching, law character committees, most other non-medical professional licensing boards, and thousands of employers in the US.

5.   Autistic JM (1) engaged in activity statutorily protected by the ADA, that being the right to have a livelihood and self-sufficiency through employment (2) he was engaged in the exercise of ADA protected rights by attempting to seek employment, free of a 22-year old Board Order which fails to recognize autism as a causative factor in JM's history (3) the Board interfered on account of his protected activity by not

---

[21] US EEOC Training and Technical Assistance Program, *Preventing Discrimination in the Workplace*, 2002

removing its Order, and intimidated Plaintiff by portraying Plaintiff as a felon [Page 25], even though there was an awareness and knowledge that the presence of this Order interfered with multiple non-medical licensure opportunities nationally, and it would be a minimal burden to remove; and (4) the Board was motivated by an intent to discriminate, by not acknowledging JM's disorder of ASD and accommodation request, which only represents a minimal burden, and would not require any significant modification of the Board's policies, practices, or procedures.  This despite a stated policy of the Board that the Board supports the Americans with Disabilities Act.

6.  <u>The Proper Use of Public Documents in Maryland (only recognized at the state level) as it relates to ADA Title II, including the Doctrines of (1) the US Congressionally approved federal right to an accommodation (2) the question of whether Modifying Policies, Practices or Procedures is an undue burden, and (3) Third Party Interference</u>

The Board will likely purport that anything can be done with a Public document Board ruling under state law, such as the Plaintiff Final Order issued in 1998, claiming absolute or qualified immunity.   Absolute or qualified immunity only exists at the state level, however, and does not supersede the Supremacy Clause or federal rights under Title II ADA to have an accommodation response or modification of policies and procedures if not an undue burden. Such immunity is also not an excuse for negligent Board reporting for 22 years and does not allow for the issuance of accompanying and supplementary reports which are different from the Final Order.

As noted above, there was no permanent licensure denial, and Plaintiff is male, and never wished to be self-identified as anything other than male, though a permanent denial and unknown gender are listed for 22 years by the Board nationally at ten different agencies.   When Plaintiff requested corrections in 2001, 2011 and 2019, only in 2019 were any corrections made, and only on the NPDB report.  As noted above, the permanent denial and unknown gender listings were removed from only the NPDB report, but replaced with a new narrative indicating that Plaintiff has poor moral character, and a notation that Plaintiff additionally committed heinous acts beyond having poor moral character.  Such references have caused Plaintiff considerable emotional distress for 22 years, as would be experienced by any autistic individual or reasonable person in a similar situation, and further substantiated the third party interference claim.

As noted *supra*, the Board and Board Counsel Noreen Rubin were made aware of the ASD disability and both chose to ignore the accommodation request completely in February 2020, and not state why the request is an undue burden, or why policies and procedures cannot be modified even minimally to accommodate such a request. Accommodation requests and disabilities cannot be ignored because the Board chooses to do so selectively and preferentially, **especially when as noted earlier, the Board states that it supports the ADA on its website and also states so in its state approved documents**.  Such statements should apply to all those with disabilities if a stated policy.

**Portraying Plaintiff as a felon, *ignoring autism*, pursuing continual admonishment**

7.  Plaintiff was and is portrayed as a felon by the Board, a portrayal which reaches most employers nationally and serves as a third party interference, and an action which has kept Plaintiff from obtaining nonmedical licensure in teaching and law, and a position in the USAF.  Third party interference in teaching and law continues to occur by the Board, including intimidation, while ignoring Plaintiff's permanent and incurable diagnosis of ASD/Autism, ADA Title II rights of receiving a reasonable accommodation response, and the minimal modification of policies and procedures to accommodate.

**Few autistics are felons nationally[22], and the Board cannot imply or equate autism/ASD with criminally leaning or related conduct, by ignoring an accommodation request.**  Despite medical licensure application questions which were not interpreted correctly due to autism, and all such vague and ambiguous questions changed after 1999 and never afterward used, the Board:

(1) describes Plaintiff in 2020 through use of statutes which are used to describe those hiding felonies, serious malpractice cases, drug use or other heinous crimes; Exhibit 7

(2) accuses Plaintiff of committing fraud without a fact pattern being entered nationally relating to application questions, interpreted by most employers and reasonable persons reviewing the accusation nationally as criminal fraud

---

[22] https://www.aane.org/asperger-syndrome-criminal-justice-system/

(3) accused Plaintiff of monetary fraud by having a returned payment request on the

1995 application

(4) negligently lists a permanent licensure denial, associated with felons, for 22 years

(5) describes Plaintiff as having poor moral character, characteristic of felons

(6) in 2019, when correcting the original 1998 NPDB report, describes Plaintiff as

committing additional heinous acts beyond having poor moral character.

(7) fails to consider any evidence ever submitted by Plaintiff, always deeming it

without merit, materiality, or relevance.  When presented, the Board never includes the

evidence in responses, as if autistic Plaintiff is a non-existent entity, as demonstrated by

the handling of the accommodation request.

(8) denied an evidentiary hearing, which never allowed for a mens rea analysis of

autism.  Summary judgments are almost never used for autistic or malintent cases.[23]

(9) attempted to have HHS debarment sanctions imposed lifelong against Plaintiff, a

lifelong permanent AMA membership ban, and permanent admonishment by Plaintiff's

medical training programs, by the Board sending the Final Order to such programs

along with derogatory comments about Plaintiff, preventing Plaintiff from ever

obtaining recommendations from such entities.

(10) attempted and is still attempting to impose a permanent national loss of

employment through background check companies which screen applicants for

---

[23] https://www.purdueglobal.edu/blog/criminal-justice/autism-and-the-criminal-justice-system/

teaching and legal positions (Exhibit 6, showing an example of a Verisys and FACIS III report provided as part of a background check).

8. <u>Further reasons for the instant filing</u>: Employment statistics nationally are often dismal for those with ASD. The article notes "..adults on the spectrum may be extremely efficient, trustworthy, reliable, and cost-effective employees. Nevertheless, fewer than half of young adults with ASD maintain a job. Many businesses are unwilling to hire these capable candidates, concerned among other things about an increase in supervision costs and a decrease in productivity. This is a bias based on misperceptions; the financial and social benefits of hiring adults with ASD, for businesses and the individual, often outweigh the costs."[24]

9. At 62 years of age, with autism/ASD, Plaintiff faces age discrimination, and disability discrimination. Given these considerations, if the Board Order from 1998 continues to occur on nonmedical licensure background checks, Plaintiff will have little or no opportunity to ever be employed in a nonmedical field requiring licensure.

## DECLARATORY RELIEF

1. This action seeks declaratory relief pursuant to 28 U.S.C. § 2201 (2011) for the purpose of **determining** a question of actual controversy between Plaintiff and Defendant.

---

[24] https://www.ncbi.nlm.nih.gov/pmc/articles/PMC4596848/

2.  Plaintiff, JM., is entitled to a declaratory judgment concerning each of Defendant's violations of the ADA, as well as the violations of the Rehabilitation Act and 42 U.S.C. § 12203(b).

## INJUNCTIVE RELIEF

1.  This action seeks injunctive relief pursuant to 42 U.S.C. § 12188 and Rule 65 of the Federal Rules of Civil Procedure.

2.  Plaintiff, JM., is entitled to a permanent injunction requiring Defendant to correct each of their violations of the ADA, Rehabilitation Act, and their implementing regulations,  as such relate to autism, by removing the 22-year old national reports on Plaintiff in Verisys, many background check companies, FACIS III, and the NPDB.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff JM. requests that the Court:

1.  Exercise jurisdiction over this action.

2.  Enter a declaratory judgment on behalf of JM., declaring that Defendant's actions are in **violation** of **Title** II of the ADA, Section **504** of the Rehabilitation Act**,** and their **implementing** regulations.

3.  Enter a permanent mandatory injunction ordering Defendant to cease its national reporting on JM, ordering Defendant to grant JM's requested modification and to accommodate JM's disability by withdrawing the Verisys and NPDB reports on

Plaintiff.

4.  General and special damages against Defendant Maryland Board of Physicians, as to be determined by the Court, but at least $75,001 for the ADA violations, and $800,000 for emotional distress caused by the Board over the prior 8 months to 22 years, including the listing of a permanent licensure denial nationally for 22 years when it never occurred, implying that a heinous act or act of moral turpitude was committed by Plaintiff, and portraying Plaintiff as a felon nationally, while ignoring his autism and reasonable accommodation request.

5.  Award to JM all costs and fees expended herein and assess all such costs.

6.  Grant JM such other and further relief as may be deemed just, equitable and appropriate by the Court.

RESPECTFULLY SUBMITTED THIS THE 11th Day of November 2020.

Jonathan Manson
6213 N Pascola Circle
Tucson, AZ   85718
jonathanmanson997@gmail.com
520-526-4025

Signed: _Jonathan Manson_
Dated: November 11, 2020

AFFIDAVIT I solemnly affirm under the penalties of perjury that the contents of the foregoing complaint are true to the best of my knowledge, information, and belief.

Signed: _Jonathan Manson_                    Date: November 11, 2020
Jonathan Manson
6213 N Pascola Circle
Tucson, AZ   85718
City State Zip
jonathanmanson997@gmail.com

CERTIFICATE OF SERVICE    I certify that I served a copy of this Motion upon all parties to the action and each identifiable person who is the subject of the case by Fedex, following submission of the Summons for signature to the Clerk's office, to:

Date submitted to Christine Farrelly:  November _____, 2020
Christine Farrelly
Executive Director
Maryland Board of Physicians
4201 Patterson Ave,
Baltimore, 21215
Person Serving Signature:  _____